AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
02/28/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: EC DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
02/28/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: __M.B.__ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH NEAL SANBERG,<br><br>Defendant. | **(UNDER SEAL)**<br><br>Case No. 2:25-mj-01068 |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of at least January 2020 through to the present in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:
  *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Alfred Herzog
Complainant's signature

Alfred Herzog, U.S. Postal Inspector
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 28, 2025

Judge's signature

City and state: Santa Ana, California   Hon. Douglas F. McCormick, U.S. Magistrate Judge
Printed name and title

AUSA: Brett Sagel (714-338-3598)

**AFFIDAVIT**

I, ALFRED HERZOG, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant for JOSEPH NEAL SANBERG ("SANBERG") for a violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud).

2.   The facts set forth in this affidavit are based upon my participation in the investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are relayed in substance and in part only, all dates are on or about those indicated, and all dollar values are approximate.

## II.   BACKGROUND OF USPIS INSPECTOR ALFRED HERZOG

3.   I am a United States Postal Inspector employed by the United States Postal Inspection Service, and I have been employed as a United States Postal Inspector since 2003. Prior to being employed as a United States Postal Inspector, I was employed as a Special Agent with the United States Secret Service for three years. Throughout my career, I have been involved in numerous arrests, served as a witness in criminal and administrative proceedings, and have been the Affiant on numerous federal search warrant and arrest warrant affidavits. While assigned to the

1

Philadelphia Division of USPIS, I primarily investigated mail theft, identity theft, mail fraud, drug trafficking and related crimes. Since June 2023, I have been assigned on a temporary basis to a USPIS mail fraud team located in the Fraud Section of the U.S. Department of Justice's Criminal Division in Washington, DC.

### III. SUMMARY OF PROBABLE CAUSE

4. From January 2020, and continuing through to the present, within the Central District of California and elsewhere, SANBERG did knowingly, and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with other individuals to commit certain offenses against the United States, namely wire fraud, that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

5. In furtherance of the conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 6 through 42 of this Complaint. Specifically, SANBERG conspired with Ibrahim Ameen AlHusseini ("ALHUSSEINI"), and others known and unknown, to make, and cause to be made, materially false and fraudulent representations and promises by

means of wire communications in interstate and foreign commerce, to induce two investor funds ("INVESTOR FUND A" and "INVESTOR FUND B") to issue two loans, for $55 million and $145 million, respectively, to SANBERG through SANBERG's closely held entity. The loans were collateralized by SANBERG's pledge of approximately 10.3 million shares in COMPANY A, a private company that SANBERG had co-founded and of which SANBERG was the largest shareholder.

6. To secure the loans, SANBERG induced INVESTOR FUND A and INVESTOR FUND B to purchase put option agreements from SANBERG's associate, ALHUSSEINI, as a type of financial guarantee for the loans issued to SANBERG. Under those put option agreements, in the event of SANBERG's default on the loan, ALHUSSEINI was obligated to purchase the 10.3 million pledged shares of COMPANY A stock. Specifically, if SANBERG defaulted on the loans, ALHUSSENI would be required to pay $55 million to INVESTOR FUND A, and later $75 million to INVESTOR FUND B, to purchase SANBERG's pledged COMPANY A shares. Accordingly, the put options required ALHUSSEINI to have sufficient assets to pay the put option amount to INVESTOR FUND A and INVESTOR FUND B in the event of SANBERG's default.

7. SANBERG knew at all relevant times that ALHUSSEINI did not have the required assets. SANBERG conspired with ALHUSSEINI to provide falsified financial statements to INVESTOR FUND A, and INVESTOR FUND B, and INVESTMENT ADVISER 1, which advised the two funds, to support the put options required to secure SANBERG's loans. The falsified financial statements inflated ALHUSSEINI's personal wealth by tens of millions of dollars and induced INVESTOR

FUND A and INVESTOR FUND B to each purchase a put option from ALHUSSEINI.

8.  As a result of the conspiracy to defraud, INVESTOR FUND B lost at least $145 million.

### IV.  STATEMENT OF PROBABLE CAUSE

#### A.  Background on Relevant Individuals and Entities

9.  SANBERG was, at relevant times, a resident of Los Angeles, California, within the Central District of California, and a co-founder and shareholder of COMPANY A.

10. ALHUSSEINI was, at relevant times, a resident of Los Angeles, California, and a citizen of the United States and Saudi Arabia.[1]

11. COMPANY A was a private company that maintained its principal office in Los Angeles County, California, within the Central District of California.  COMPANY A provided consumer financial products and sustainability services.  SANBERG was a co-founder of COMPANY A and its largest shareholder, and SANBERG and ALHUSSEINI served on the board of directors of COMPANY A.

12. INVESTOR FUND A was an investment fund that loaned investors' capital to high-net-worth borrowers, with its principal place of business in New York, New York.

---

[1] ALHUSSEINI was charged by information under seal on January 21, 2025, with one count of wire fraud, in violation of 18 U.S.C. § 1343, and is expected to plead guilty.  See United States v. AlHusseini, Case No. 25-CR-42-SVW (C.D. Cal.).  A change-of-plea hearing is set for March 3, 2025.

13. INVESTOR FUND B was an investment fund that loaned investors' capital to high-net-worth borrowers, with its principal place of business in New York, New York.

14. INVESTMENT ADVISER 1 was a securities investment adviser that advised INVESTOR FUND A and INVESTOR FUND B, and maintained offices in New York, New York.

15. GRAPHIC DESIGNER 1 was an individual living in Lebanon and an associate of ALHUSSEINI.

16. FMR LLC d/b/a Fidelity Investments ("Fidelity") was a registered securities broker-dealer and had its headquarters in Boston, Massachusetts.

17. Bank of America Corporation ("BofA") was an investment bank and financial services company and had its headquarters in Charlotte, North Carolina.

B. **SANBERG and ALHUSSEINI Conspired to Fraudulently Sell a Put Option to INVESTOR FUND A to Secure a $55 Million Loan for SANBERG**

18. Based on my review of records from INVESTMENT ADVISER 1, beginning no later than January 2020, SANBERG began negotiating the terms of a $55 million loan from INVESTOR FUND A to SANBERG through SANBERG's closely held company. Under the terms of the loan, SANBERG would pledge approximately 10.3 million shares of COMPANY A stock as collateral.

19. Based on my review of company records, I know that COMPANY A was a non-public company, and there was not a liquid market to sell COMPANY A stock. Further, I know from a review of

5

INVESTOR FUND A records that INVESTOR FUND A required SANBERG to find a buyer for the 10.3 million shares of COMPANY A stock as a hedge against the risk that COMPANY A's shares could not be sold on the open market at a value equal or greater to the value of the $55 million loan.

20. Based on an interview with ALHUSSEINI, I know that to secure the loan, SANBERG recruited ALHUSSEINI to enter a put option agreement with INVESTOR FUND A (the "March 2020 put option"). A put option is an investment contract in which the seller is obligated to purchase an asset from the buyer at a pre-determined price at the buyer's option. Put options can operate to hedge the risk that an asset may lose value by lining up a buyer willing to pay a set price, typically in exchange for a risk premium.

21. In this instance, I know from INVESTOR FUND A records that the March 2020 put option obligated ALHUSSEINI, and two entities that ALHUSSEINI controlled, to purchase the 10.3 million shares of COMPANY A stock from INVESTOR FUND A for $55 million if SANBERG defaulted on the loan and INVESTOR FUND A took possession of the shares pledged as collateral.

22. I know based on INVESTOR FUND A records and interviews with ALHUSSEINI that, as a condition of making the loan to SANBERG, INVESTMENT ADVISER 1 sought information and documentation to verify that ALHUSSEINI had sufficient liquid assets to pay $55 million for the shares of COMPANY A stock in the event of SANBERG's default.

23. The put option acted as a form of a financial guarantee on the $55 million loan from INVESTOR FUND A to SANBERG by

mitigating the risk to INVESTOR FUND A if SANBERG defaulted on the loan. Representatives of INVESTOR FUND A have told me that the $55 million loan to SANBERG was contingent on INVESTOR FUND A entering into the March 2020 put option agreement with ALHUSSEINI.

24. Based on my review of written messages between SANBERG and ALHUSSEINI, I know that SANBERG knew that ALHUSSEINI did not have sufficient assets to cover the $55 million put option obligation. SANBERG, however, took actions to prevent INVESTMENT ADVISER 1 from discovering this fact. For example, on January 25, 2020, SANBERG advised ALHUSSEINI what to say to INVESTMENT ADVISER 1 in order to defraud INVESTOR FUND A into entering into the March 2020 put option with ALHUSSEINI based on false representations and false pretenses. SANBERG advised ALHUSSEINI about the "key points" to convey to INVESTMENT ADVISER 1 about SANBERG and COMPANY A to successfully sell the put option. SANBERG advised ALHUSSEINI to say that:

    a. ALHUSSEINI "want[ed] the entire [] put for [him]self" rather than including other guarantors because ALHUSSEINI thought the opportunity to acquire 10.3 million COMPANY A shares for the strike price of the put option was such a good deal;

    b. ALHUSSEINI was "extremely familiar" with COMPANY A's future financial prospects and therefore ALHUSSEINI believed he was "basically getting free money with the premium;"

    c. ALHUSSEINI should provide "[p]ositive character references about [SANBERG];"

7

   d. ALHUSSEINI should request a 10% up-front payment (also known as a "premium payment") for the put option because, "if there isn't a put premium for the put seller they will be suspicious. No legitimate seller of a put would do so without demanding an up-front premium."

  25. Records provided by ALHUSSEINI reflect that the following day, on January 26, 2020, SANBERG introduced ALHUSSEINI to INVESTMENT ADVISER 1 as an interested seller of the put option.

  26. Based on a review of ALHUSSEINI's financial documents, I know that ALHUSSEINI did not have sufficient assets to fulfill these net worth requirements. During interviews with law enforcement, ALHUSSEINI has confirmed that ALHUSSEINI and ALHUSSEINI's two co-signing entities did not have enough assets to purchase the 10.3 million shares of COMPANY A stock in the event of SANBERG's default. ALHUSSEINI has also confirmed that SANBERG was aware that ALHUSSEINI did not have sufficient assets.

  27. Nonetheless, from January 26, 2020, through at least March 16, 2020, SANBERG continued to conspire with ALHUSSEINI to falsify and conceal ALHUSSEINI's true financial assets to induce INVESTOR FUND A to purchase the put option from ALHUSSEINI. For example:

   a. On February 4, 2020, ALHUSSEINI sent SANBERG a template spreadsheet showing a sample investment portfolio for ALHUSSEINI from several years earlier. During interviews with law enforcement, ALHUSSEINI stated that this template spreadsheet was not an accurate reflection of his portfolio and that he told SANBERG the spreadsheet was "hypothetical." SANBERG revised the

portfolio template to falsely represent that it showed ALHUSSEINI's assets as of December 31, 2019, and re-titled the document "Husseini Group Asset Overview." Later that day, ALHUSSEINI's counsel sent the false chart edited by SANBERG to INVESTMENT ADVISER 1 as a false representation of ALHUSSEINI's assets.

b. On February 6, 2020, SANBERG counseled ALHUSSEINI regarding how to avoid sending ALHUSSEINI's financial statements to INVESTMENT ADVISER 1. Specifically, SANBERG advised ALHUSSEINI to have ALHUSSEINI's "lawyer attest to it rather than showing them statements." Based on law enforcement interviews with ALHUSSEINI, I believe SANBERG gave this advice because SANBERG knew that ALHUSSEINI's true financial statements would reflect that ALHUSSEINI had insufficient funds to cover the put option.

c. On February 21, 2020, INVESTMENT ADVISER 1 asked ALHUSSEINI to transfer ALHUSSEINI's liquid assets to a segregated account so INVESTMENT ADIVSER 1 could monitor the balances. SANBERG knew that if ALHUSSEINI agreed to the transfer request, INVESTMENT ADVISER 1 would discover that SANBERG and ALHUSSEINI were fraudulently concealing ALHUSSEINI's true financial status. In response, SANBERG accused INVESTMENT ADVISER 1 of acting in bad faith and threatened to call off the deal to deflect the request.

28. I know from records provided by ALHUSSEINI that, beginning February 23, 2020, SANBERG and ALHUSSEINI prepared false brokerage and bank statements to present to INVESTMENT ADVISER 1 and to defraud INVESTOR FUND A. I have reviewed SANBERG and ALHUSSEINI's emails with INVESTMENT ADVISER 1 concerning financial

statements, and I have reviewed Signal (an encrypted messaging application) and text messages provided by ALHUSSEINI between SANBERG and ALHUSSEINI regarding their plan to create and submit falsified asset statements to INVESTMENT ADVISER 1. For example:

   a. On February 23, 2020, SANBERG and ALHUSSEINI discussed the falsified statement balance that would be reflected on the falsified statements. ALHUSSEINI expressed concern that "having an 84m [$84 million] statement will hurt us" because INVESTMENT ADVISER 1 would be more likely to ask for documentation on a single large account than on multiple smaller accounts under $50 million. SANBERG and ALHUSSEINI also met with GRAPHIC DESIGNER 1 in person to create falsified brokerage and bank account statements for ALHUSSEINI.

   b. On March 10, 2020, INVESTMENT ADVISER 1 requested ALHUSSEINI's current bank account statements. Later that day, ALHUSSEINI sent SANBERG falsified Fidelity and BofA statements in ALHUSSEINI's name, asking SANBERG to "[p]lease confirm all in order." Later that day, from within the Central District of California, ALHUSSEINI submitted the falsified statements to INVESTMENT ADVISER 1, claiming that those falsified statements were a true and accurate securities brokerage account statement as of December 31, 2019, of ALHUSSENI's investment portfolio with Fidelity. ALHUSSEINI's falsified Fidelity account statement falsely represented that ALHUSSEINI held more than $86 million in securities in accounts at Fidelity. In fact, ALHUSSEINI's true Fidelity account statements show that a total of $4,390.10 was in the account as of December 31, 2019. According to ALHUSSEINI,

SANBERG and ALHUSSEINI agreed to falsify these statements to defraud INVESTOR FUND A and to finalize the deal for the March 2020 put option that was a precondition for the $55 million loan to SANBERG.

  c. On March 13, 2020, INVESTMENT ADVISER 1 requested ALHUSSEINI to submit a "snapshot" of his account statements. ALHUSSEINI emailed a screenshot of his true BofA account to GRAPHIC DESIGNER 1. ALHUSSEINI later forwarded a falsified BofA statement received from GRAPHIC DESIGNER 1 to SANBERG.

  29. Based on my review of records from INVESTMENT ADVISER 1, I know that on March 16, 2020, SANBERG and INVESTMENT ADVISER 1 executed a $55 million loan from INVESTOR FUND A to SANBERG through SANBERG's closely held company, and INVESTOR FUND A simultaneously purchased the March 2020 put option from ALHUSSEINI.

C. **SANBERG Refinanced the Loan and Obtained $145 Million from INVESTOR FUND B Guaranteed by a $65 Million Put Option by ALHUSSEINI**

  30. Based on records from INVESTMENT ADVISER 1, I know that on November 4, 2021, SANBERG refinanced the $55 million loan against his 10.3 million shares of COMPANY A stock. Under the refinanced loan, INVESTOR FUND B loaned $145 million to SANBERG, and SANBERG pledged the same 10.3 million shares of COMPANY A stock as collateral.

  31. As a condition of making the refinanced $145 million loan to SANBERG, INVESTMENT ADVISER 1 negotiated for INVESTOR FUND B to purchase a new put option from ALHUSSEINI, in which ALHUSSEINI

was obligated to pay $65 million to INVESTOR FUND B in the event that SANBERG defaulted on the $145 million loan (the "November 2021 put option"). Again, the terms of the November 2021 put option required that ALHUSSEINI have sufficient assets to pay $65 million to INVESTOR FUND B in the event of SANBERG's default.

32. I know from records provided by INVESMENT ADVISER 1 that under the terms of the November 2021 put option, approximately $6.3 million was to be paid to ALHUSSEINI at the time of execution as a premium payment in consideration for guaranteeing SANBERG's repayment of the loan.

33. ALHUSSEINI has stated in interviews with law enforcement that SANBERG and ALHUSSEINI again agreed to falsify ALHUSSEINI's asset statements and send them to INVESTMENT ADVISER 1 to defraud INVESTOR FUND B. For example, on November 4, 2021, ALHUSSEINI directed his agent to send an email to INVESTMENT ADVISER 1, which contained a falsified Fidelity account statement as of September 30, 2021. The account statement falsely represented that ALHUSSEINI held more than $199 million in securities in accounts at Fidelity. ALHUSSEINI also sent a falsified BofA statement that falsely represented that as of September 22, 2021, ALHUSSEINI held more than $21 million in his accounts.

34. In fact, ALHUSSEINI's true Fidelity account statements show that as of September 30, 2021, ALHUSSEINI's Fidelity accounts held a total of approximately $2,693.63. ALHUSSEINI's BofA account statement shows that as of September 22, 2021 held approximately $11,556.89.

> **D.    SANBERG Directed GRAPHIC DESIGNER 1 and ALHUSSEINI to Send Falsified Brokerage Account Statements to INVESTMENT ADVISER 1**

35. To maintain and conceal SANBERG and ALHUSSEINI's deception of INVESTMENT ADVISER 1, INVESTOR FUND A, and INVESTOR FUND B, ALHUSSEINI conspired with SANBERG to continue to submit falsified brokerage statements to INVESTMENT ADVISER 1 on at least 24 occasions between April 2020 and February 2023.

36. Based on my review of records from INVESTMENT ADVISER 1, Fidelity, and BofA, ALHUSSEINI's falsified brokerage statements were altered to falsely represent that ALHUSSEINI's brokerage account held highly liquid and publicly tradeable securities that were, depending on the month and year, worth between approximately $80 million to $200 million.  In fact, ALHUSSEINI's brokerage account during this period held between approximately $2,000 and $15,000.  ALHUSSEINI's BofA statements also falsely represented that ALHUSSEINI's bank accounts were worth between approximately $21 million to $25 million. In fact, ALHUSSEINI's personal bank accounts during this period held between approximately $11,000 and $500,000.

37. SANBERG directed ALHUSSEINI and GRAPHIC DESIGNER 1 to create these falsified Fidelity brokerage statements and BofA statements.  For example:

   a.   Records provided by ALHUSSEINI reflect that on October 9, 2020, SANBERG coordinated a time to meet with GRAPHIC DESIGNER 1 through ALHUSSEINI to guide GRAPHIC DESIGNER 1 in

13

falsifying ALHUSSEINI's monthly statements to submit to INVESTMENT ADVISER 1.  I have reviewed messages sent via Signal in which SANBERG directed ALHUSSEINI to take a screenshot of his BofA welcome screen and ALHUSSEINI's personal BofA statement and Fidelity statement.  SANBERG directed ALHUSSEINI to send those materials to GRAPHIC DESIGNER 1, who would then send the falsified statements to SANBERG through Signal.  ALHUSSEINI sent his true BofA and Fidelity statements and screenshots to GRAPHIC DESIGNER 1 via email and told GRAPHIC DESIGNER 1 that SANBERG asked to receive the files through Signal.

   b.  I have reviewed a Signal message provided by ALHUSSEINI which shows that the next day, October 10, 2020, SANBERG sent an attachment to ALHUSSEINI and advised ALHUSSEINI, "This is to add to what you send to [INVESTMENT ADVISER 1]."  Based on other records from ALHUSSEINI, I believe that attachment contained a falsified list of ALHUSSEINI's assets, and that ALHUSSEINI sent this falsified document to INVESTMENT ADVISER 1 on October 10, 2020, at SANBERG's direction.

   c.  On February 7, 2021, ALHUSSEINI sent SANBERG a message with a screenshot from a Fidelity customer support chat, indicating that due to a Fidelity policy change there was no January account statement available for ALHUSSEINI's Fidelity account. ALHUSSEINI asked SANBERG, "Suggestions?  There is no jan [*sic*] statement."  SANBERG responded, "hmm.  that's easy.  We can use the prior statement as the basis."  ALHUSSEINI replied, "Ok.  Wanted to check in.  Sending to [GRAPHIC DESIGNER 1] now."  On

February 10, 2021, ALHUSSEINI submitted a falsified Fidelity account statement for January 2021 to INVESTMENT ADVISER 1.

38. Based on records from ALHUSSEINI, I know that between January 2023 and February 2023, while the scheme was still ongoing, SANBERG was also included on emails between ALHUSSEINI and GRAPHIC DESIGNER 1 attaching copies of ALHUSSEINI's falsified Fidelity and BofA statements, as well as copies of ALHUSSEINI's true Fidelity and BofA statements.

39. I know from records provided by INVESTMENT ADVISER 1 that nearly all of the email transmissions of Fidelity brokerage statements and BofA bank statements to INVESTMENT ADVISER 1 transmitted between April 2020 and March 2023 were accompanied by a certificate of compliance, in which ALHUSSEINI affirmed by electronic signature that the account statements, were "in each case true, correct and complete copies." These representations were materially false because the account statement balances had been altered as described above.

E. **SANBERG Defaults on the Refinanced Loan Causing At Least $145 Million in Loss to INVESTOR FUND B**

40. In November 2022, SANBERG defaulted on the loan to INVESTOR FUND B, and to secure a forbearance, ALHUSSEINI signed a December 5, 2022, amendment with INVESTOR FUND B that raised the put option price to $75 million.

41. On June 27, 2023, after SANBERG defaulted on the $145 million loan, INVESTOR FUND B exercised the November 2021 put option that contractually required ALHUSSEINI to pay INVESTOR

15

FUND B $75 million in exchange for approximately 10.3 million shares of COMPANY A stock. I know from records provided by INVESTMENT ADVISER 1 that ALHUSSEINI has not performed on the November 2021 put option and has not purchased the shares from INVESTOR FUND B.

## V. CONCLUSION

42. SANBERG and ALHUSSEINI conspired to defraud INVESTOR FUND B by falsely inflating ALHUSSEINI's available assets by tens of millions of dollars. ALHUSSEINI's purported assets were intended to secure ALHUSSENI's purchase of the 10.3 million shares of COMPANY A stock held as collateral against the $145 million loan. When SANBERG defaulted on the $145 million loan, ALHUSSEINI also defaulted on the November 2021 Put Option.

43. As a result of SANBERG's fraud, INVESTOR FUND B had losses of at least $145 million, which was loaned to SANBERG in reliance on the falsified financial statements that SANBERG directed ALHUSSEINI to submit to support the put options.

44. On February 28, 2025, law enforcement conducted physical surveillance in Orange, California outside of a home believed to be used by SANBERG. Law enforcement observed an individual believed to be SANBERG exit the home and depart in a vehicle.

//

//

45.  For all of the reasons described above, there is probable cause to believe that SANBERG conspired to commit wire fraud, in violation of 18 U.S.C. § 1349.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 28th day of
February, 2025.

_____
HON. Douglas F. McCormick
UNITED STATES MAGISTRATE JUDGE